AO 106 (Rev. 04/10) Application for a Search Warrant (requesting AUSA Robert E. Eckert)

# UNITED STATES DISTRICT COURT
for the
Eastern District of Pennsylvania

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No.  18-1332-M
One Flip Phone Seized from Humberto Almonte )
)
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the ___Eastern___ District of ___Pennsylvania___ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) | Distribution of Controlled Substances |
| 18 U.S.C. 2 | Aiding and Abetting |

The application is based on these facts:
See attached affidavit

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Task Force Officer Brian T. Myers, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: August 20, 2018

*Judge's signature*

City and state: Philadelphia, PA

The Hon. Carol Sandra Moore Wells U.S. Mag. Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT FOR PHONE SEIZED FROM HUMBERTO ALMONTE

I, Brian Myers, being duly sworn and according to law, depose and state the following:

### GENERAL BACKGROUND

1. I have been employed by the Philadelphia Police Department as a Police Officer since 1996, and I have been employed as a Task Force Officer with the FBI since 2012. I am currently assigned to the Philadelphia Safe Streets Violent Gang Task Force, which is comprised of agents from the FBI and the Department of Homeland Security, as well as officers from the Philadelphia Police Department.

2. Since becoming a Task Force Officer with the FBI, I have participated in numerous investigations concerning unlawful drug importation and distribution, in violation of Title 21, United States Code, Sections 841(a)(1), 843, 846, 952, 960, and 963, as well as money laundering, in violation of Title 18, United States Code, Section 1956. I have participated in physical surveillance, the execution of search warrants, debriefings of cooperating witnesses, and the review of telephone, financial, and drug records. I have been trained in various aspects of law enforcement, including the investigation of narcotics offences.

3. Through my training, experience, and education from working with other officers and agents, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and other methods of payment for drugs. I know, for example, that drug trafficking generates substantial bulk cash at lower-level wholesalers and street-level drug sales, and that cash must be collected and accumulated for integration and laundering into and through the financial system. Typically, drug traffickers coordinate with money launderers to effect "pickups" of bulk cash in cities where their drug product is distributed. Money launderers, through a variety of methods including "smurfing" (deposit of smaller amounts of cash into bank accounts in order to avoid law enforcement detection), accomplish the pickup and deposit of cash into the financial system, all with the goal of integrating the cash into the financial system and transfer back to Mexico or other source countries.

4. This affidavit is made in support of a Search Warrant Application for authority to search one cellular telephone that was seized form HUMBERTO ALMONTE, DOB: October 6, 1969.

5. The below Subject cellular telephone was seized during the arrest of HUMBETO ALMONTE on May 25, 2016, by FBI Task Force Officers (TFOs). The cellular telephone seized from ALMONTE is described as a blue and black flip style phone, Model Z222, IMEI 869265012122585, Serial Number 327B33200B40, FCC ID Q78-Z222.

6. As set forth below, there is probable cause to believe that the above-mentioned subject cellular telephone contains evidence, fruits, and instrumentalities of crimes against the United States occurring in this judicial district, specifically, violations of Title 21, United States Code, Section 841(a)(1), Distribution of one kilogram or more of heroin, and Title 18 United States Code, Section 2, aiding and abetting the possession of a controlled substance with the intent to distribute. It is believed that these subject cellular telephone will still contain evidence, fruits, and instrumentalities of crimes against the United States, as the subject cellular telephones have been in the custody of law enforcement officials since they were seized.

7. Based on my training, knowledge and experience, as well as the training, experience and knowledge of other officer and agents, I have learned the following in connection with investigating those involved in illegal trafficking of controlled substances and detection of dealing in proceeds of unlawful activity: Individuals involved in illegal activity and drug dealing commonly maintain addresses or telephone numbers in books or papers or in cellular telephones which reflect names, addresses and/or telephone numbers of their associates in the illegal organization and/or individuals involved in their narcotics and money laundering activities; individuals involved in narcotics trafficking frequently list drug associates on cellular phone directories, often by nickname or code, to avoid detection by law enforcement and other individuals who would able to identify them; and a review of a telephone's directory is one of the few ways to verify the numbers (that is, the cellular phones, pagers, etc.) being used by specific targets, conspirators, and associates; individuals involved in narcotics trafficking often utilize multiple cellular phones

to attempt to conceal their identity, avoid detection by law enforcement and to facilitate their drug trafficking activities. I also know that drug traffickers frequently use cellular telephone functions, such as text-messaging, email and voice communications, to communicate with other co-conspirators, buyers and suppliers in furtherance of their drug trafficking activities. Often, drug traffickers use multiple cellphones for their drug trafficking, in an effort to conceal their phone contact numbers and illegal activities from law enforcement and other individuals.

8. This affidavit is based upon my personal knowledge, experience and training, and other information developed during the course of this investigation. This affidavit is also based upon information and experience imparted to me by other law enforcement officers.

**PROBABLE CAUSE**

9. On May 23, 2016, Task Force Officers were conducting surveillance of a location in Philadelphia, Pennsylvania, that they know to sell supplies used to package heroin for street sale. These supplies include blue glassine packets which are commonly used to package individual dosage units of heroin. The blue glassine packets are purchased in bulk and come packaged in small brown cardboard boxes. At approximately 2:00pm, a Kia bearing Pennsylvania license plate JPL-2563 was observed arriving at the store. A female, later identified as BRAULIZABETH REYES VILLANUEVA, was observed entering the store. Approximately 10 minutes later, VILLANUEVA was observed exiting the store carrying a black plastic bag and returning to the Kia. The black plastic bag appeared to contain small boxes similar in size and shape to those that contain new glassine packets which are used to package heroin.

10. Officers followed VILLANUEVA from the area to 7100 block of Souder Street. VILLANUEVA parked the Kia on the street, exited the vehicle carrying the same black plastic bag she had been observed placing in the car earlier and entering the front door of 7119 Souder Street, Philadelphia, Pennsylvania. Officers established surveillance of the residence and observed a black Honda sedan bearing Pennsylvania license plates KCJ-0729 parked in the rear alley.

3

11. At approximately 4:30pm, Officers observed a Hispanic male ("HM1") exit the rear of 7119 Souder Street, open the driver's door of the Honda and sit in the drivers seat without closing the door. Officers observed HM1 remove a brown bag from his pants pocket and remove objects from the bag and place them in the driver's side door pocket. HM1 then placed the brown bag inside a tan plastic Wawa bag. HM1 exited the Honda and placed the tan Wawa bag, which contained the original brown bag, in a garbage can belonging to a neighbor across the rear alley.

12. A second Hispanic male, later identified as OSCAR CRUZ RETO, was then observed exiting the rear of 7119 Souder Street. RETO opened the rear passenger door of the Honda and spent a few minutes do something in the rear of the vehicle. RETO then removed a white bag with black writing from the rear of the Honda and placed the bag in the trunk of the Honda. During this time, both RETO and HM1 were observed cautiously looking around.

13. RETO was then observed walking to a burgundy Hyundai Santa Fe SUV which was parked on Horrocks Street. RETO was observed sitting in the front seat. During the time RETO was walking to the Hyundai, HM1 entered the Honda and drove to where the Hyundai was parked. HM1 double parked the Honda just behind the Hyundai and waited in the Honda. A few minutes later, the Hyundai, driven by RETO, pulled from its parking spot and left the area followed by the HM1 in the Honda. The vehicles were not followed from the area.

14. Once both RETO and HM1 left the area, Office Brian Myers retrieved the tan plastic Wawa bag he had earlier observe HM1 put in a neighbors trashcan. Officer Myers recovered the brown bag he had observed HM1 place in the Wawa bag. Inside the brown bag were numerous small black rubber bands which are consistent with those usually used to bundle packaged heroin.

15. On May 24, 2016, law enforcement personnel established surveillance in the area of 7119 Souder Street. The Hyundai Santa Fe was observed parked in the vicinity of 7119 Souder Street.

16. At approximately 11:00am, RETO was observed exiting the rear of the residence, walking to and entering the Hyundai. RETO drove the Hyundai directly to the rear alley and parked behind 7119 Souder Street. RETO exited the vehicle and retrieved a large multicolored bag from the vehicle. The bag

4

appeared to contain numerous boxes consistent in size and shape as to those which glassine packets are sold in. RETO quickly took this bag into 7119 Souder Street.

17. A short time later, RETO was observed exiting the rear of 7119 Souder Street, entering the Hyundai and departing the area. Officers followed RETO to the 3100 block of Knorr Street where RETO was observed parking the Hyundai and entering through the front of 3106 Knorr Street. The black Honda from the previous day's surveillance was also observed parked on the 3100 block of Knorr Street.

18. Approximately 20 minutes later, RETO, HM1 and a third Hispanic male ("HM2") were observed exiting 3106 Knorr Street. RETO walked to and entered the Hyundai and HM1 and HM2 entered the Honda. Both vehicles departed the area and were followed by officers. While driving, both vehicles displayed behavior consistent with someone attempting to detect surveillance. The vehicles would make sudden turn as well as pull over and park for apparently no reason.

19. The vehicles were followed to the 800 block of Sanger Street. Officers set up in a position to view the vehicles. Without provocation, the Honda pulled away and drove slowly down Sanger Street past Officer Myers. One block away, the Honda did a U-turn and again drove past Officer Myers vehicle. Officer Myers was able to see HM1 leaning forward in his seat attempting to look inside Officer Myers vehicle. The Honda continued down the street and parked directly behind the Hyundai.

20. Approximately five minutes later, Officers observed a Hispanic male, later identified as HUMBERTO ALMONTE, exit 890 Sanger Street. ALMONTE was carrying a tan plastic bag and was observed looking in all directions. ALMONTE approached the passenger side window of the Honda, handed the tan bag through the window and returned inside 890 Sanger Street. The Honda and the Hyundai were observed leaving the area together. Officers did not follow the vehicle from that location for fear of being detected.

21. Officers set up surveillance in the vicinity of 3106 Knorr Street and 7119 Souder Street. Officers observed both the Honda and the Hyundai parked in the vicinity of 7119 Souder Street. The Kia observed on May 23rd was also observed parked in the area.

5

22. Later that day, RETO and HM2 were observed exiting the rear of 7119 Souder Street and entering the Honda. RETO and HM2 departed the area and were lost in traffic. Surveillance was terminated.

23. On May 25, 2016, Officer and Agents executed a Commonwealth of Pennsylvania search warrants at 7119 Souder Street. RETO and VILLANUEVA were located inside the property and detained. A search of the residence resulted in the discovery of a large amount of heroin packaging material, including boxes of new and unused glassine packets, over one kilogram of heroin, and $8,506 in US currency. RETO and VILLANUEVA were arrested and charged with narcotics violations.

24. Surveillance was setup at 890 Sanger Street and ALMONTE was observed leaving the residence, entering a white SUV and departing the area. ALMONTE was stopped and detained. A cell phone (Subject phone) was recovered from the vehicle.

25. Agents and Officers then executed a Commonwealth of Pennsylvania search warrant at 890 Sanger Street. A search of the residence resulted in the discovery of $4,000 in US currency.

26. Task Force Officer Eric Ramos met with ALMONTE and read him his Miranda rights in Spanish. ALMONTE waived his Miranda rights and agreed to speak with Officer Ramos. ALMONTE stated that he was paid to deliver kilograms of heroin and received $2,000 for each kilogram he delivered. ALMONTE stated that he had delivered heroin the previous day to the occupants of a black Honda sedan. ALMONTE was also arrested and charged with narcotics violations.

## EVIDENCE TO BE SEIZED

27. In my experience and training, as well as the experience and training of other officers and agents, I believe the seized cellular telephone contains evidence, fruits, and instrumentalities of crimes against the United States occurring in this judicial district, specifically, a violation of Title 21, United State Code (USC) Section 841, Possession with Intent to Distribute a Controlled Substance; Title 18, United States Code (USC) Section 2 Aiding and Abetting.

28. In my experience and training, as well as the experience and training of other officers and agents, I know narcotics traffickers often utilize electronic equipment, such as cellular telephones, to

6

generate, transfer, count, record, and/or store information related to criminal activities.

29. In my experience and training, as well as the experience and training of other officers and agents, I further know narcotics traffickers commonly utilize their cellular telephones to communicate with co-conspirators to facilitate their narcotics and money laundering operation. Additionally, narcotics traffickers often use multiple cellular phones to minimize their chances of being intercepted by law enforcement by communicating with conspirators and associates over cellular phones.

30. In my experience and training, as well as the experience and training of other officers and agents, I further know narcotics traffickers use cellular phones to store text messages and other information relevant to narcotics transactions, including but not limited to methods of trafficking narcotics, sources of supply, and prices, type and amount of narcotics. Cellular phones can also supply historical information about the dates, times, duration, number, destination, and location of telephone calls, messages, photographs, video, audio, and other information processed or stored by the cellular telephone which would be evidence of criminal activity.

31. In my experience and training, as well as the experience and training of other officers and agents, I know narcotics traffickers and money launderers often store contacts lists, address books, calendars, photographs (including photos of co-conspirators and associates in the drug trafficking activity), video and audio files, financial data (including but not limited to credit card bills, account information, accounts receivable, accounts payable, general ledgers, cash disbursement ledger, check register, employment records, and correspondence), banking data (including but not limited to monthly savings and checking statements, canceled checks and banking communications, deposit tickets, withdrawal receipts, certificates of deposits, pass-books, money drafts, blank or endorsed money orders, check cashing logs, wire transfer logs, cashier's checks, bank checks, money orders, safe deposit boxes, money wrappers and wire transfers), assets (including but not limited to the possession, sale, purchase, transfer, and/or storage of any and all tangible or intangible assets, including but not limited to vehicles, real estate, and jewelry,

regardless of the identity of the person(s) involved), identification records (including but not limited to applications for birth certificates, state identification cards, social security cards, and driver's licenses text messages), intonational and domestic travel records, and voice mails in their cellular telephones or other electronic devices. Such data, as identified above, as well as the cellular telephone's number itself (also stored in the cellular telephone) is relevant to showing the identities of co-conspirators, particular conspirators' contact with other coconspirators, and their contacts.

32. In my experience and training, as well as the experience and training of other officers and agents, I also know narcotics traffickers and money launderers frequently list drug associates in directories, often by nickname, to avoid detection by others. Also, I know that the narcotics traffickers and money launderers rarely subscribe to telephones in their own names, making it difficult to link a particular telephone, pager, or residence line to a particular trafficker or launderer. Such directories as the ones likely contained in the seized cellular telephone are one of the few ways to verify the numbers (i.e., telephones, pagers, etc.) being used by specific traffickers and launderers.

33. In my experience and training, as well as the experience and training of other agents, I also know narcotics traffickers often utilize multiple cellular phones to attempt to conceal their identity, avoid detection by law enforcement and to facilitate their drug trafficking activities.

## ELECTRONIC DEVICES AND STORAGE

34. This application seeks permission to search and seize things that the cellular telephone identified above might contain, in whatever form they are stored. Based on my experience and training, as well as the experience and training of other officers and agents, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

## MOBILE PHONES

35. Based on Your Affiant's training and experience I know that most people, including criminals carry and use mobile phones and that these phones contain call histories, call logs, contacts, emails and phone book information, pictures and images and text message logs.

36. The Device is currently in the lawful possession of the FBI, whose offices are located at 600 Arch Street, Philadelphia, PA. The Device is in secure storage at that location. Based on my training and experience, I know that the Device has been stored in a manner in which its contents, to the extent material, are in substantially the same state as when they first came into law enforcement's possession.

## TECHNICAL TERMS

37. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera often as part of a cellular telephone, that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.

9

Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer

software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

38. Based on my training, experience, common knowledge and research, and/or from consulting the manufacturer's advertisements and product technical specifications available online. I know that cellular telephones often have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### ELECTRONIC STORAGE AND FORSENSIC ANALYSIS

39. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. This information can sometimes be recovered with forensics tools.

40. Forensic evidence. As further described in Attachment A, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

41. Nature of examination. Based on the foregoing, and consistent with Rule 41(e) (2) (B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

42. Manner of execution. Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

43. Searching for the evidence described in Attachment B may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment B, or perusing all stored information briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, the FBI intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B.

## CONCLUSION

44. Based on the above facts, I believe there is probable cause that the fruits, and or evidence of crime, specifically in violation of Title 21, United State Code (USC) Section 841, Distribution of a controlled substance and Title 18, United States Code (USC) Section 2 Aiding and Abetting, will be found in the information stored in the cellular telephone identified above, and therefore I request that the court issue a search warrant for this information.

Respectfully submitted,

*[signature]*

BRIAN T. MYERS
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to before me on August 20, 2018.

*[signature]*

HONORABLE CAROL SANDRA MOORE WELLS
*United States Magistrate Judge*

## **ATTACHMENT A**

### PROPERTY TO BE SEARCHED

The property to be searched is as follows:

The flip phone described above is a cellular telephone that was seized during the arrest of HUMBERTO ALMONTE on May 25, 2016 by FBI Task Force Officers (TFOs). The above phone is stored at FBI Philadelphia Field Office, 600 Arch Street, Philadelphia, PA.

## ATTACHMENT B

### EVIDENCE TO BE SEARCHED FOR AND SEIZED

All info that constitutes evidence of violations of 21 U.S.C. § 841(a)(1), and 18 U.S.C. § 2 involving Humberto Almonte and his confederates, including information pertaining to the following matters:

a. lists of customers and related identifying information, including contact phone numbers and email addresses;

b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

c. any information related to sources of narcotic drugs, including names, addresses, phone numbers, or any other identifying information;

d. any information related to the methods of trafficking in narcotics;

e. photographs of associates, co-conspirators, and other evidence of drug trafficking;

f. any information recording domestic and intonational schedule or travel;

g. any and all information related to credit card bills, account information, and other financial records, including but not limited to, accounts receivable, accounts payable, general ledgers, cash disbursement ledger, check register, employment records, and correspondence;

h. any and all information related to identification records, including but not limited to applications for birth certificates, state identification cards, social security cards, and driver's licenses;

i. any and all banking information, including but not limited to monthly savings and checking statements, canceled checks and banking communications, deposit tickets, withdrawal receipts, certificates of deposits, pass-books, money drafts, money orders (blank or endorsed), check cashing logs, wire transfer logs, cashier's checks, bank checks, money orders, safe deposit boxes, money wrappers and wire transfers;

j. any and all information relating in any way to the possession, sale, purchase, transfer, and./or storage of any and all tangible or intangible assets, including but not limited to vehicles, real estate, and jewelry, regardless of the identity of the person(s) involved; and

k. stored electronic information and communications, including but not limited to, telephone or address directory entries consisting of names, addresses and telephone numbers, schedule entries, photographs, audio, and video. Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted. such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms records and documents include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including, but not limited to any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.